**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

October 16, 2026

**BY ECF AND EMAIL**
The Honorable Cathy Seibel
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

**Re: *United States v. Michael Vasconcellos*, 25 Cr. 383 (CS)**

Dear Judge Seibel:

Michael Vasconcellos held a position of public trust. Specifically, he was entrusted with ensuring the safety and integrity of natural gas pipelines buried in heavily populated neighborhoods throughout this district, including the Bronx and Westchester County. But Vasconcellos abused that trust. He chose to lie about his teams having inspected hundreds of pipeline welds. And as a result, he put the thousands of people living around the impacted gas pipelines at risk of gas leaks or explosions.

The Government respectfully submits this letter in advance of Vasconcellos's sentencing, which is currently scheduled for October 19, 2026. As explained below, a sentence within the Guidelines range stipulated to by the parties—57 to 60 months' imprisonment—is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

## A. Background

### 1. The Offense Conduct

**Background on Non-Destructive Testing Radiography**

To provide natural gas services to customers, utility companies must install and maintain gas pipelines throughout their areas of service. PSR ¶ 12. Installing a gas pipeline typically requires positioning the gas pipe into the ground in segments and then welding those segments together. *Id.* Below is a photograph of a portion of a natural gas pipeline showing two pipe segments that have been welded together. *Id.*




Before the pipeline can be put into service, someone must inspect the welds along the pipeline to assess their quality. PSR ¶ 13. That includes both a visual inspection and an additional inspection using one or more non-destructive testing ("NDT") methodologies. *Id.* A common form of NDT testing to assess the integrity of pipeline welding is radiography. PSR ¶ 14.

NDT radiography involves radiographing each weld and then reviewing the radiograph films to identify any anomalies that cause the weld to fall below certain pre-defined acceptance standards.[1] PSR ¶ 15. The welder must repair material anomalies in the weld before the pipeline is put into service. *Id.* Failure to repair a material anomaly before a pipeline is put into service can lead to critical failures, including gas leaks or even explosions. *Id.*

At a given work site, the NDT team is typically composed of two technicians: a Level II Radiographer (or "Level II RT") and a Level I Radiographer (or "Level I RT"). PSR ¶ 16. The Level II RT is the more senior technician and is the one in charge of taking the radiographs, as well as interpreting the film after it is developed. *Id.* The Level I RT functions as an assistant to the Level II RT. *Id.*

In many cases, the pipeline that is being radiographed will already have been positioned in a ditch that is numerous feet deep before the radiograph process takes place. PSR ¶ 17. Those pipelines are often accessible only by climbing down into the ditch using a ladder and may require the radiographer to crouch or lay in relatively tight spaces. *Id.* Below is an image of a radiographer climbing down to inspect a gas pipeline; the pipeline itself is visible between the wooden slats. As a result, performing radiographs, especially on the underside of pipelines, can sometimes be difficult, exhausting work.

---

[1] Radiography testing, for simplicities sake, can be thought of as x-ray testing. In actuality, however, the testing uses gamma-ray radiation.



The radiographer(s) begin the radiography process by applying a "number belt" to the pipeline. PSR ¶ 18. A number belt is usually a piece of double-sided tape that is wrapped around the full circumference of the pipe right next to the weld that is being radiographed. *Id.* On the number belt will be small lead numbers called "location markers" (lead is used because the character/number will be "burned" into the film when the radiograph is taken). *Id.* The location markers are spread out equal distances from one another. *Id.* For example, a number belt may include a location marker every 13 inches, so the top of the belt would have a lead number "0," then a lead number "13," then a lead number "26," and so on. Because each weld requires numerous films to radiograph the weld's full circumference, the location markers help identify which portion of the weld a given film covers. *Id.*

Once the number belt is positioned, the radiographer(s) will set up the films. The films are rectangular shaped and are typically held flush against the pipeline using a bungie cord. PSR ¶ 19. Below is a photograph of a gas pipeline showing radiograph films affixed to the pipe. Because the films are not long enough to encircle the full circumference of a gas pipeline, multiple films are used to shoot every weld. *Id.* To ensure that there are no gaps between those films, the radiographer(s) will often overlap films on the edges. *Id.* For larger pipes, even multiple films will cover only a portion of the pipe's full circumference (typically, radiographers shoot only 3 or 4 films at a time). *Id.* As a result, it may take multiple shots, using multiple films each time, to radiograph the full circumference of a single weld. *Id.*



As the films are being set up, lead identification markers in addition to the location markers on the number belt are placed between the pipeline and the film. PSR ¶ 20. Using lead characters, the radiographer(s) will include the date the radiograph is being taken, the weld ID (a unique identifier for that specific weld), and the name of the pipeline. These lead identification markers—like the location markers—will be "burned" into the radiograph film, allowing the reviewer to know which weld a given film concerns and the date on which the radiograph was taken.

Once the films and various lead identifiers are in place, the NDT radiographer(s) will position the radiograph "source." The source is a radioactive isotope that is housed inside of an exposure device (essentially, a box designed to shield the isotope) that has a long hose (called the "guide tube") on the end. When the radiograph process begins, the source will move from the exposure device to the end of the guide tube to expose the radiographic film. Once the source is at the end of the guide tube, the radiation from the source will begin to interact with the film, creating the radiographic images. Below are photographs of the exposure device, the source, and the guide tube.





After the source is positioned, the radiographer(s) will climb out of the ditch housing the pipeline and move back a safe distance, which will be demarcated with ropes. Once there, the radiographer(s) will send the source down the guide tube (called "cranking out the source") and start the radiograph process. The amount of time that the source must remain exposed outside the exposure device that houses it will increase over time, as the source will grow weaker as the radioactive element decays; however, even when new, the source usually needs to be left exposed for a few minutes at a minimum.

Once that process is done and the source is safely back inside the exposure device, the radiographer(s) must climb back down into the pipeline's ditch and remove the film. As noted above, depending on the size of the gas pipeline, the radiographer(s) will either then replicate that process to finish radiographing the rest of the weld's circumference or, if they were able to shoot the entire circumference in one go, move on to the next weld.

After a series of films are finished, the Level II RT will take the raw film to a truck with an attached dark room that is located at the work site. The Level II RT will then develop the films inside the dark room and interpret them to assess whether there are any material anomalies in the weld. If so, those anomalies are reported to the welder and the weld must be repaired. Material anomalies, if left unrepaired, can lead to failures in the pipeline, including gas leaks.

Following this review, the Level II RT prepares and signs a radiograph inspection report that identifies and confirms each weld that has been reviewed and approved, along with certain material information about those welds and how the radiograph inspection was conducted. That report is then shared with the utility company that hired the radiographers.

**<u>Fraudulent Testing of Utility-1's Natural Gas Pipelines</u>**

Between at least in or about 2018 and in or about 2019, Utility-1 (a utility company servicing, among other locations, New York City and Westchester County) hired Company-1 to perform NDT radiography on various natural gas pipelines that Utility-1 was installing. PSR ¶ 27. During that time, Michael Vasconcellos was the primary Level II RT who was inspecting the safety of Utility-1's welds. *Id.* Liam Treibert also worked at Company-1 during that period, and spent a portion of it assisting Vasconcellos with his NDT work. *Id.* As a result, Vasconcellos was, in effect, Treibert's boss.

In or about early 2020, Utility-1 transitioned its NDT business to Company-2 after numerous Company-1 employees moved there, including Treibert and Vasconcellos. PSR ¶ 27. Over the next two-and-a-half years, until about May 2023, Company-2 performed a large volume of NDT work for Utility-1. *Id.* That included work inspecting natural gas pipelines that Utility-1 was installing across the Bronx and Westchester. *Id.*

Throughout at least this full period, 2018 through 2023, Vasconcellos and Treibert, at Vasconcellos's direction, frequently submitted duplicate radiography films to Utility-1, a practice referred to in the NDT industry as "radaring." PSR ¶ 28. Specifically, "radaring" is the practice of passing off films taken of one weld as films taken of a second weld (or, alternatively, films taken of one portion of a weld as films taken of another portion of that same weld). *Id.* The result is that radiographers engaging in radaring will inspect only a portion of the welds they are supposed to,

but will hide that fact through duplication. For instance, a Level II RT could radiograph Weld A twice, and then claim that the second set of films are of Weld B, even though the Level II RT never radiographed that second weld.

Vasconcellos was frequently engaging in radaring while inspecting Utility-1's pipelines in his role at Company-1. PSR ¶ 29. And once Treibert began assisting Vasconcellos, Vasconcellos directed Treibert to engage in radaring as well, and taught him various methods for doing so. *Id.* The two continued to practice radaring when they moved over to Company-2, and even brought in a third individual to assist, a Level I RT who worked at Treibert and Vasconcellos's direction. *Id.* Vasconcellos, therefore, orchestrated a multi-person scheme, spanning two companies, to repeatedly lie about safety inspections.

Vasconcellos and Treibert typically engaged in radaring in various situations, the most common of which were:

- In situations where radaring would keep the job moving quickly and avoid holding up work being performed by other people on the pipelines (such as welders). The purpose of this was to ensure that the work Vasconcellos and Treibert were performing for Utility-1 appeared to be efficient. PSR ¶ 30(a).

- In situations where Vasconcellos or Treibert were simply tired or a given weld would be particularly challenging to radiograph. The purpose of this was to make the job easier for the radiographers. PSR ¶ 30(b).

Vasconcellos also used various steps, which he showed to Treibert, to hide their fraud. PSR ¶ 31. For example, Vasconcellos taught Treibert to make up non-material issues with certain welds for purposes of their reports so that it looked like they were actually assessing welds (consistently submitting reports showing that every weld was perfect would raise suspicions).[2] *Id.* The two would also often move the number band on the pipe between taking duplicate shots to ensure that duplicate films would not line up exactly, making it harder to detect the fraud. *Id.*

As a result of the fraudulent scheme orchestrated by Vasconcellos, many hundreds of welds across Utility-1's natural gas pipelines were never inspected. PSR ¶ 32. Moreover, Utility-1 was unaware that these inspections did not occur, as Vasconcellos and Treibert created inspection reports that were sent to Utility-1 by email that claimed, falsely, that the two had inspected the welds. *Id.* As a result, Utility-1 paid tens of thousands of dollars for testing work that Vasconcellos and Treibert never actually performed.[3] *Id.*

Utility-1 learned of this fraud in or about the first half of 2023, and has been working to remediate the harm since that time. That remediation has required Utility-1 to excavate many of the pipelines that were impacted by this radaring so that the welds can be tested; absent that

---

[2] Even welds with problems do not need to be fixed so long as the problems are not serious enough to cause the weld to fall below industry standards.

[3] Both the emails and the payments, which were sent via bank wire, traveled across state lines. PSR ¶ 32.

remediation work, Utility-1 determined that it would be unable to assess the integrity of the affected welds. As of the time of the plea, the most recent remediation figure that Utility-1 had provided to the Government was $8.2 million. PSR ¶ 33. Since then, Utility-1 has reported that its total remediation costs have climbed above $64.28 million.

### 2. Other Criminal Conduct

Although not included in the information to which Vasconcellos pleaded, Vasconcellos engaged in other, similar fraudulent conduct while employed at Company-1 and Company-2.

*First*, in addition to natural gas pipelines, Vasconcellos and Treibert also performed NDT radiography on steam pipelines installed by Utility-1 in New York City. PSR ¶ 58. As with the natural gas pipelines, Vasconcellos and Treibert, at Vasconcellos's direction, frequently engaged in radaring when inspecting those welds. *Id.*

*Second*, while working at Company-1, Vasconcellos helped to certify welders. PSR ¶ 59. In essence, private companies would pay to have Vasconcellos review sample welds that were performed by the companies' welders, so that those welders could receive necessary certifications. *Id.* While working on those certifications, if the sample weld was deficient, Vasconcellos would frequently throw it away and replace it with a sample that could be passed, so that Vasconcellos would be able to certify the welder regardless of their skill. *Id.*

*Third*, Vasconcellos caused fraudulent paperwork to be prepared related to the transportation of the radioactive source used to conduct NDT radiography. PSR ¶ 60. Specifically, under Title 10 and Title 49 of the United States Code, both the Department of Energy and the Department of Transportation are tasked with overseeing various safety protocols surrounding the storage, transportation, and use of hazardous materials like radioactive isotopes. *Id.* Under 49 C.F.R. §§ 172.200, 172.201, and 172.202, when an entity like Company-2 is transporting a radioactive source from their facilities to a job site, they must prepare what is called "shipping paper." *Id.* Among other information required to be included in that shipping paper is (i) the level of radiation emanating from the source, measured in "terabecquerels"; and (ii) the "transport index." *See* 49 C.F.R. § 172.203(d)(3) and (5). A transport index is a function of that radiation level. The transport index is then combined with the duration of the transport to determine the distance that the shipping entity must ensure exists between the radioactive source and the shipper's employees (*i.e.*, how far apart the source must be from the people moving it during the transport). The applicable distance for each transport index and shipping duration is set forth in a chart found at 49 C.F.R. § 177.842(b)(2).

By law, entities like Company-2 are required to retain a copy of their shipping papers for at least two years. *See* 49 C.F.R. § 172.201(e). Those papers must then be made available, upon request, to an authorized official of a Federal, State, or local government agency at reasonable times and locations. *Id.* The Pipeline and Hazardous Materials Safety Administration ("PHMSA"),

an agency within the Department of Transportation, is one such authorized entity, and it performs audits of transport paperwork to ensure that radioactive material is moved in a manner that is safe.

Between at least 2020 and 2023, Vasconcellos and Treibert, at Vasconcellos's direction, frequently prepared false or fraudulent shipping papers in connection with their work at Company-2. PSR ¶ 63. Specifically, Company-2 needed to transport a radioactive source from its facilities to work sites in order to perform NDT radiography. *Id.* When doing so, Vasconcellos and Treibert often created shipping papers that intentionally underreported the transportation index. Those false or fraudulent shipping papers were most commonly created in the days or weeks after Company-2 began using a new radioactive source, since newer sources have higher levels of radioactivity, and thus higher transportation indices, which would require more rigorous safety protocols. *Id.* Vasconcellos directed that those false papers should be created to hide the fact that they were not adhering to the appropriate radiation safety standards.[4] *Id.*

## B. Procedural History and Guidelines Calculation

On or about August 25, 2025, a grand jury returned an indictment charging Vasconcellos and Treibert with one count of wire fraud stemming from their radaring while inspecting Utility-1's natural gas pipelines. Vasconcellos was arrested a few days later without incident. On or about April 21, 2026, Vasconcellos waived indictment and pleaded guilty, pursuant to a plea agreement, to a single-count superseding indictment, with conspiring to commit wire fraud, in violation of 18 U.S.C. § 371.

According to the parties' plea agreement, the applicable offense level is 25, which, combined with Vasconcellos's presence in Criminal History Category I, sets the stipulated Guidelines range at 57 to 60 months' imprisonment (the "Stipulated Guidelines Range").[5] The Presentence Report calculates a slightly different Guidelines range based on a difference in loss amount calculation, as explained at paragraph 103 of the Presentence Report. But as reflected in the Presentence Report and in Vasconcellos's submission, PSR at 32; Def. Mem. at 5, the Government stands by the parties' plea agreement and advocates that the Court adopt the Stipulated Guidelines Range of 57 to 60 months imprisonment.

## C. Discussion

### 1. Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin

[4] The people put at the greatest risk by this fraud were Vasconcellos and Treibert themselves, given that they spent the most time close to the source.

[5] Pursuant to U.S.S.G. § 5G1.1(c), the top end of the agreed upon Guidelines range was reduced from 71 months to the 60 month statutory maximum sentence permitted under 18 U.S.C. § 371.

all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**2. A Sentence within the Stipulated Guidelines Range is Appropriate**

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 57 to 60 months' imprisonment is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

*First*, a sentence within the Stipulated Guidelines Range is appropriate due to the nature and circumstances of the offense and the need to provide just punishment. *See* 18 U.S.C. § 3553(a)(1) & (2)(A). Vasconcellos's conduct was incredibly dangerous. By repeatedly lying about having inspected welds, Vasconcellos put at risk the thousands of New Yorkers who live near the gas pipelines on which he worked. If even one of those welds had failed, that could have led to gas leaks or even, possibly, an explosion, which in turn could have injured or killed those nearby. On top of that, Vasconcellos's actions cost a public utility company millions of dollars, some or all of which may ultimately be borne by the end users of the utility's services—the very people whose safety Vasconcellos jeopardized.

The severity of Vasconcellos's conduct is further exacerbated by his role in the offense. Vasconcellos was no mere bit player. He held positions of authority at both Company-1 and Company-2, and personally directed others at those companies, including Treibert, to engage in radaring. Vasconcellos abused the trust placed in him to engineer this scheme, and then caused others to whom he should have been a role model to engage in fraud alongside him.

As Vasconcellos points out, it appears that he did not receive any extra payments for engaging in this fraud. Def. Mem. at 3. But that does little to reduce the severity of his actions. To the contrary, it demonstrates that Vasconcellos was willing to put thousands at risk simply to make his testing teams look more efficient and/or to avoid testing welds that would have been particularly difficult to radiograph. In many ways, the fact that Vasconcellos engaged in this conduct without the prospect of any financial gain is an aggravating factor, demonstrating how little Vasconcellos thought about those he was putting at risk and the millions of dollars his fraud would eventually cost to remediate.

*Second*, a sentence within the Stipulated Guidelines Range is necessary to achieve the twin aims of general and specific deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Starting first with general deterrence, despite the importance of NDT work and the consequences if that work is not done properly, the industry relies largely on radiographers to self-police. On top of that, even where radaring is suspected, radiographers can take steps to hide their misconduct, such as by shifting or flipping radiograph films between shots, thereby making it more challenging to identify instances of duplication. In other words, rooting out and prosecuting radaring is a challenging endeavor. Far more instances of radaring go undetected than result in prosecution. Accordingly, the deterrent effect of a significant sentence in this case is one of the most important means of ensuring that conduct of this sort does not re-occur moving forward. By contrast, if one of the very few radaring prosecutions brought by federal authorities ends in a non-incarceratory sentence, even after years of misconduct and hundreds of impacted welds, the Government respectfully submits that the industry and radiographers would be sent the entirely the wrong message.

For similar reasons, specific deterrence calls for a sentence far more significant than the non-incarceratory term sought by Vasconcellos. Vasconcellos spent years lying over and over again. Sometimes those lies concerned gas pipeline inspections, other times they concerned steam pipeline inspections, and still other times they concerned radiation safety paperwork. While the lies themselves changed, Vasconcellos's willingness to engage in misconduct was consistent. And on top of that, Vasconcellos showed that he has no problem misusing supervisory authority over others to convince them to help him in his crimes. Against that backdrop, the Government submits that a multi-year prison sentence is necessary to deter Vasconcellos from additional offenses in the future.

For the same reasons that a non-incarceratory sentence would send the wrong message to the industry at large, so too would it send the wrong message to Vasconcellos. And while Vasconcellos argues that he has "already begun to suffer the consequences of his misconduct," Def. Mem. at 15, that does not change the significant need for specific deterrence. Indeed, as Vasconcellos's own submission makes clear, while his conduct cost him his job at Company-2, it has not prevented him from continuing to work in the NDT industry. So if Vasconcellos is not deterred, he easily could engage in radaring again in the future.

### 3. Restitution

The parties' plea agreement obligates Vasconcellos pay restitution towards Utility-1; although the plea agreement did not contain a cap on the total restitution figure, it set an agreed upon floor of at least $8.2 million. PSR ¶ 3. The Government submits that the appropriate restitution amount in this case is $64,288,522.27, which is the Government's current understanding of the costs that Utility-1 has borne remediating the impacts of Vasconcellos's fraud. PSR ¶ 33.

## Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence between 57 and 60 months' imprisonment.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

by: /s/
David Markewitz / James McMahon
Assistant United States Attorney
212-637-2260

cc: Counsel of Record (by ECF)