**SAPONE & PETRILLO, LLP**
Litigation Law Firm
40 Fulton Street / 17th Floor
New York, NY 10038
(O): (212) 349-9000
(E): ed@saponepetrillo.com
www.saponepetrillo.com

October 26, 2026

**BY ECF**
The Honorable Cathy Seibel
United States District Judge
United States District Court for the Southern District of New York
The Hon. Charles L. Brieant Jr. Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

*Re: United States v. Michael Vasconcellos*
*Ind. No.: S2 25 Cr. 383 (CS)*

Dear Judge Seibel:

Defendant Michael Vasconcellos has spent most of his life showing up for other people. He spent his childhood growing up in the Bronx avoiding violence and drugs while remaining supportive and loyal to his immigrant parents. He was barely 21 when he had his first daughter. When her mother could not raise her, he did, along with her two older siblings, who are not his biological children. When his father was dying, Michael remained by his side. Today his 82-year-old mother, a cancer survivor, and 87-year-old uncle both depend on him. Michael drives them to their many doctor appointments, interprets what those doctors tell them, and does just about everything else they cannot do for themselves. Michael never excelled in school, but he worked hard. He worked his way up from processing concrete in the Bronx to become a certified inspector.

There is no excuse for what Defendant Michael Vasconcellos did to earn a seat at defendants' table in Your Honor's courtroom. While he did not do it to get rich, and never took more than his paycheck, he most certainly broke the law and failed people. Michael is guilty; he admits that and, as he makes an honest assessment of himself, he is sorry for his terrible actions.

I ask Your Honor to see that the man who sunk so low is the same man on whom three generations of his family lean, the same man who has spent the last three years demonstrating that he has learned from his horrible conduct by stopping substandard work on his new job rather than passing it through. Michael can be punished while he makes amends without being taken both from the young and elderly people who need him.

On October 28th, Your Honor will sentence Michael Vasconcellos for Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §371. He conspired to tell Con Edison that he and others radiographed welds on its piping when, in fact, many welds were never inspected. Weld inspection exists to protect the public, and Michael was trusted to do that job honestly. He failed, and he knows it. While he has a right to trial and if he were to exercise that right you would not hold that against him, Michael has chosen, instead, to do what is right by accepting responsibility. With a heavy heart, he approaches sentencing. He has a burning desire to make amends to Con Edison while he continues to be a hands-on father, husband and son.

Michael is 45 years of age. He has been loyal to his wife of 18 years and has been a loving and proactive father of his three children. Michael's children are ages 13, 17 and 24. He supports a three-generation household here in Westchester County where he houses and cares for his octogenarian mother and uncle.

Since his arrest more than a year ago, Michael has complied with every condition of pretrial release, tested negative on every drug test, and worked full-time as a structural steel inspector for an employer that knows everything about this case and wants to keep him gainfully employed.

Federal sentencing has been a big part of my legal career, and I take to heart the factors of §3553(a), including, among other things, the need to punish, deter, and avoid unwarranted sentencing disparities. I firmly believe that crimes must carry consequences for the offender. And I remain mindful that we sentence people, not crimes; and not just people, but the whole person. There is more than one way to punish and deter, and we are called to consider the kinds of sentences available. After much deliberation, I respectfully request that Your Honor sentence Michael Vasconcellos to time- served, and:

- three years of supervised release, with the following conditions:
- the first 12 months to be served on home confinement;
- full-time employment, with a fixed percentage of Michael's monthly income paid toward the restitution the Court orders to Con Edison;
- 500 hours of community service;
- and, separately, an order of forfeiture as determined by the Court.

I respectfully ask the Court to consider that while we, in no way, minimize Con Edison's remediation costs, the loss amount is not driven by money Michael gained, as he received no money from this scheme beyond his salary. And he has since worked honestly—and in plain view of the industry, under much oversight since the discovery of this crime in 2023.

A sentence of time-served, a year of confinement to his home, three years of supervision, orders of forfeiture and restitution and a lifetime felony conviction following the career Michael spent 15 years building is sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. § 3553(a).

## I. The Sentencing Guidelines

Whether the Court is guided by the loss figure determined by the Probation Department or the Government in the plea agreement, Michael's effective Guidelines range is 60 months or 57 to 60 months.

| | **Plea Agreement** | **PSR** |
|---|---|---|
| Base offense level (§§ 2X1.1(a), 2B1.1(a)(2)) | 6 | 6 |
| Loss (§ 2B1.1(b)(1)) | +18 (more than $3.5 million; $8.2 million) | +22 (more than $25 million; $64,288,522.27) |
| Abuse of trust or special skill (§ 3B1.3) | +2 | +2 |
| Aggravating role (§ 3B1.1(c)) | +2 | +2 |
| Acceptance of responsibility (§ 3E1.1(a), (b)) | −3 | −3 |
| **Total offense level** | **25** | **29** |
| Criminal History Category | I | I |
| Range | 57–71 months, capped at 60 (§ 5G1.1(c)(1)) | 87–108 months, capped at 60 (§ 5G1.1(a)) |

*See* PSR ¶¶ 43–53, 102–03.

The parties have stipulated to an actual loss of approximately $8.2 million, "based on the most recent information provided to the Government by [Con Edison]" as of April 2026. *See* Plea Agreement at 2 & n.1. Michael agreed to pay restitution of at least $8.2 million. *Id.* at 2.

After Michael entered into the change of plea, Con Edison told the Government that its remediation expenses had grown to $64,288,522.27, and the Government, as it was obligated to do, passed that figure along to Probation. Probation used it to calculate an offense level of 29. PSR ¶¶ 33, 103.

The Government and I ask the Court to adopt the stipulated offense level of 25 and the Stipulated Guidelines Range of 57 to 60 months. It is my understanding that the Government stands by the plea agreement and advocates for the Guidelines range of 57 to 60 months of imprisonment.

Michael's criminal history score is zero.[1]. No mandatory minimum sentence applies. Michael was arrested on August 28, 2025, and released the same day. PSR ¶ 40. The Court may impose a sentence of time-served followed by a term of supervised release of up to three years. 18 U.S.C. § 3583(b)(2); PSR ¶ 104.

## II. Nature and Circumstances of the Offense

Before a gas pipeline goes into service, every weld should be radiographed and the film read by a Level II Radiographer, who certifies that the weld meets acceptance standards. PSR ¶¶ 13–26.

From 2018 to 2023, at Certified Testing Laboratories ("CTL") and Vibranalysis, Michael and his co-defendant engaged in "radaring": passing off films of one weld, or one section of a weld, as films of another. PSR ¶¶ 28–30. Inspection reports falsely certifying those welds were

[1] In 1999 at age 17, Michael was adjudicated as a youthful-offender for attempted petit larceny. He paid a $405 fine. At age 18, he had a marijuana arrest that was dismissed. PSR ¶¶ 55–56, 65.

emailed to Con Edison, which paid CTL and Vibranalysis for testing that was not performed. PSR ¶ 32.

The PSR finds that radaring happened when it "would keep the job moving quickly and avoid holding up work being performed by other people on the pipelines," and when Michael or his codefendant were "tired or a given weld that would be particularly challenging to radiograph." PSR ¶ 30. Radiographing a single large-diameter weld can require many separate exposures, each followed by climbing back into a trench, repositioning film and lead markers, and retreating behind a radiation boundary. PSR ¶¶ 17–23. Michael cut corners under production pressure and fatigue. That was wrong, and it was dangerous. And it is not an excuse that this was going on before Michael did it, that Michael properly radiographed the vast majority of welds, or that he got no money beyond his paycheck.

The money Con Edison paid for the uninspected work went to Michael's employers, and the PSR describes it as "tens of thousands of dollars." PSR ¶ 32. The PSR identifies no kickback, no side payment, and no hidden asset. Michael's financial statement shows a family carrying more than $136,000.00 in credit card debt and running a monthly deficit of roughly $2,300.00 PSR ¶¶ 95–96.

Once Con Edison learned of the misconduct in 2023, it could not tell which welds were sound without excavating and re-testing them. PSR ¶ 33. That remediation is costly, and it is a direct consequence of Michael's conduct. He knows that he must make restitution for it.

We also address the additional conduct described in PSR ¶¶ 57–63, which the Government has proffered and which Probation suggests the Guidelines may not capture. PSR ¶ 118. We recognize that the Court may consider it, and ask that you weigh two points. *First*, as to

steam pipelines, the PSR states that radaring "was often done at the express direction of a ConEd project manager," who told the radiographers that certain welds "could not fail inspection." PSR ¶ 58. That does not excuse Michael's conduct, but it describes a workplace in which the victim's own personnel pressed for passing results. This was happening well before Michael was even hired. *Second*, the welder-certification and shipping-paper conduct arose from the same industry, the same employers, and the same time period, and reflects the same failing: putting speed ahead of the rules.

Michael's work since 2023 is important. As shown by the scores of letters in the attached Exhibit, and as discussed below, his friends and family have witnessed in Michael an honorable family man. The colleagues who have worked beside him describe an inspector in Michael who halts non-conforming work, refuses to sign off on welds that fail code, and stands his ground when contractors push back. He had lived a long and honest private and professional life before he engaged in the instant misconduct, he has learned a valuable lesson, and is proving that on a daily basis.

## III. History and Characteristics

Michael was born in the Bronx on February 1, 1981, the younger of two sons of his immigrant parents Mario and Alicia. Dad drove a cab and mom worked in a warehouse until, when Michael was 10, they opened a small restaurant. PSR ¶¶ 67–70. The family was working-class. When Michael was 12, they moved to another part of the Bronx where they could afford to live. Within weeks, there was an exchange of gunfire on the block, and some of Michael's friends lived in public housing where people smoked crack in the hallways. Michael told Probation, "I

could've easily gone the wrong direction," and that he tried to rise above it and "be better than his environment." PSR ¶ 70.

School was not his strength. He left high school six credits short of graduating. PSR ¶ 88. Years later, in January 2009 as a working father, he earned a GED. PSR ¶ 89.

In 2002 when Michael was 21, his daughter, Jasianna, was born. Her mother could not raise her, so Michale raised her from infancy. He has full custody of her. PSR ¶ 73; *see also* letter of Gloria DeMaio. Exhibit, p. 11. He also helped raise Jasianna's two older half-siblings, who are not his biological children. PSR ¶ 73. Monica DeMaio, who has known Michael for more than a decade, writes:

> Michael became a father at a young age, at a time when neither he nor his daughter's mother was truly prepared for parenthood. Yet Michael did not run from that responsibility. He embraced it and stepped up and became the father that little girl needed by taking full custody of her.

*See* Exhibit, p. 33.

Jasianna is now 24. She was married in July of this year, and is pregnant with Michael's first grandchild. Her husband was honorably discharged this year from the U.S. Army. She is a teacher of children with special needs who is pursuing a master's degree in education. PSR ¶ 73. Jasianna writes:

> He raised not only me and my two younger siblings, but also stepped in to raise my two older siblings who are not biologically his. He has never treated any of us differently and has always provided love, stability, and guidance to each of us. [. . .] During a difficult period in my life in my early college years, I struggled and made poor choices. Throughout that time, he remained a constant source of support, never giving up on me and always guiding me back in the right direction.

*See* Exhibit, p. 27.

Michael and his wife Debra have been together for 22 years. PSR ¶ 74. They have two children: "M," 17, a high school senior and baseball player who will graduate next year, and "M," 13, who just started high school. PSR ¶ 75. Debra writes:

> My husband is the backbone of our family. He is the person we depend on, the person who keeps us together, and the person who has always worked hard to provide for and protect the people he loves.

*See* Exhibit, p. 7.

M, Michael's 13-year-old daughter, is a freshman in high school:

> I have watched my dad work tirelessly to provide for our family, staying up late into the night just to make sure we have everything we need. No matter how exhausted he was, he never let it take away from being present in our lives. [. . .] My dad is not just part of my life, he is the center of it.

*See* Exhibit, pp. 25–26.

Everyone who knows Michael and his family says the same thing about Michael as the backbone of his family, including his involvement at his children's games, practices, and cheer competitions. His son-in-law, Nicholas DiCairano, describes summer weekends "consumed by his son's very demanding baseball schedule" and notes that Michael "never misses any of his son's games." *See* Exhibit, p. 6. Anthony Martinez, a retired public safety officer and retired correction officer who met Michael in 2017 when their sons played travel baseball together, writes:

> Based on my many years of experience in public safety and corrections, I have had the opportunity to observe and evaluate people from many walks of life, and in my opinion, Michael is a man of strong character who strives to do the right thing.

*See* Exhibit, p. 30.

As mentioned, Michael's household in Westchester County is home not only to Debra and their two children, but also to his 82-year-old mother who was diagnosed with thyroid cancer two years ago, his 87-year-old maternal uncle, and his mother-in-law. PSR ¶¶ 68, 77. Michael's father died in 2016 after suffering from epilepsy, Alzheimer's disease, and Parkinson's disease. PSR ¶ 68. Michael's mother, Alicia, with the help of family members shares her thoughts about her son:

> Before his father passed away, Michael was by his side as he battled dementia. I watched my son help care for him during that painful time, offering support, dignity, and love when we needed it most. He also carried me through that difficult season, giving me strength when I felt I had none left.

*See* Exhibit, p. 1.

Timothy DeMaio, who has known the family for more than 20 years, describes, among other things in a lengthy letter, Michael's daily role:

> He transports family members to doctor's appointments, assists them with navigating healthcare issues, communicates with physicians when necessary, and helps coordinate medical care. Because both his mother and uncle have limited English proficiency, Michael frequently serves as their advocate and interpreter, ensuring they understand medical instructions, appointments, and important decisions affecting their health and well-being.

*See* Exhibit, p. 46.

Michael's longtime friend Juan Gonzalez, Jr. recalls that when Michael's father was dying, Michael "would call me to vent, and I would listen to how much he missed his father." *See* Exhibit, p. 32. Michael's cousins, Rusty Bajaña (p. 38) and James Weinheimer, (p. 36) and his wife's cousin, Isolina Santiago (p. 12), each describe the same man: the person the family calls when they are in need.

Michael did not inherit a profession; he earned it with hard work. In 2011, Timothy DeMaio hired him at CTL as an entry-level concrete testing assistant. Michael pushed to learn radiography, attended radiation safety courses, earned his Level I and then Level II certifications, and eventually became lead radiographer. *See* Exhibit, p. 41. He then earned the credentials that support his career today: Certified Welding Inspector (American Welding Society); Concrete Field Testing Technician (American Concrete Institute); and Structural Welding, Structural Masonry, Structural Steel and Bolting, and Spray-Applied Fireproofing Special Inspector (International Code Council). PSR ¶ 90.

Michael's employment at Vibranalysis ended because of his misconduct in this case. He did not have the luxury of giving up; instead, he started over. He has since worked full-time for American Construction Testing Services ("ACTS") as a structural steel inspector, at a fraction of his former salary. PSR ¶¶ 91–92. Michael was honest with his boss when he sat him down and told him about this case. PSR ¶ 91.

We recognize that the Court may look sideways at colleagues who vouch for the honesty of a man who has admitted to falsifying inspection reports. But I offer these letters to Your Honor as they describe how Michael has done his job since he reinvented himself following the loss of his career and under the scrutiny of an industry that knew about the investigation. Edwin Hopkins, P.E., the Technical Director of ACTS's special inspection agency, signs off on the welding inspections Michael performs. He writes:

> There have been many instances in which Michael reached out to me to report an issue at a job site or to advise me that a contractor was not following the required standards. He consistently stood firm that he would not sign off on work that did not comply with the Building Code and applicable industry standards, including

> those published by AWS (American Welding Society) and AISC (American Institute of Steel Construction).

*See* Exhibit, p. 9.

Jennifer Gomez, a Senior Special Inspector who has worked with Michael since August 2023, gives specific examples demonstrating that Michael has learned from his mistakes:

At 510 Gates Avenue in Brooklyn, the masonry subcontractor was replaced several times because of non-conformances, "many of which [Michael] personally identified and documented." At 70-35 113th Street in Queens, he oversees welding inspections on a support-of-excavation system. She confirms:

> When he encounters a condition that is unclear or atypical, he does not make assumptions; instead, he promptly reaches out to colleagues, supervisors, or the design team to obtain clarification, which reflects his humility and commitment to doing the right thing rather than the easy thing.

*See* Exhibit, pp. 17–18.

Victoria DeMaio, an operations manager who worked with Michael at Vibranalysis and now at ACTS, recalls a 2025 project on Amsterdam Avenue where Michael found structural steel that did not conform to the design or the building code, halted the work, and saw the remediation through over objections from the general contractor and owner. See Exhibit, p. 4.

Joshua Weissman, the founder and CEO of ACTS, has known Michael for 15 years. He writes that Michael "has a place at ACTS and a professional future with our company," and adds:

> He is valued here, and should the Court permit him the opportunity to return to his family, his career, and his community, I intend to continue supporting him and providing him with meaningful employment. He will have structure, responsibility, and people around him who care about his success.

*See* Exhibit, p. 21.

In his written statement submitted through the Probation Department, Michael writes:

> I have spent meaningful time reflecting on my actions and their impact on the people who matter most to me. My family has shown me the depth of the pain I caused, and I am profoundly remorseful for breaking the promises I made to them.

PSR ¶ 39.

## IV. The Disproportionality of Loss and the Remaining Factors of 18 U.S.C. §3553(a)

The factors below point to a sentence that punishes Michael, keeps him under years of strict supervision, and keeps him working to pay restitution.

### A. Loss Table is Disproportionate to Defendant's Financial Gain

Michael's base offense level is six. The loss table adds 18 levels under the plea agreement, or 22 under the PSR.

The Second Circuit has recognized what we know: "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Senior Judge Stefan R. Underhill, sitting by designation alongside judges Katzmann and Wesley in *United States v. Corsey*, has written that "the loss guideline is fundamentally flawed." 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J., concurring); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (Rakoff, J. reaching same conclusion *albeit* with more powerful punch).

In *Corsey*, Judge Underhill specifically cautioned against allowing the loss table to overwhelm the otherwise applicable offense level. Sitting by designation he focused on the

unusual structure of U.S.S.G. §2B1.1: the Guideline assigns fraud a base offense level of only six, and then permits loss to become the principal determinant of the sentencing range.

In *Algahaim*, loss increased one defendant's offense level by 10 levels, from 6 to 16, and the other's by 12 levels, from 6 to 18. 842 F.3d at 800. Although those calculations were correct under the Guidelines, the Second Circuit nevertheless remanded so that the district court could consider whether "the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id.* The Court explained that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

The concern identified in *Algahaim* is substantially more pronounced here. We, too, begin at level six, but loss, alone, adds 18 levels under the parties' stipulation and 22 levels under the PSR—far greater increases than the 10- and 12-level enhancements that prompted the Second Circuit's remand in *Algahaim*. And, here, the disconnect between loss and culpability is especially stark. Michael did not pocket the millions of dollars attributed to him as loss, and did not set out to cause Con Edison to incur any cost. The loss figure increased approximately eightfold after Michael pleaded guilty, even though nothing about Michael's conduct changed. The resulting Guidelines increase measures the magnitude of Con Edison's subsequent remedial expenditures far more than it measures Michael's gain. We, of course, agree that those expenditures are properly included in the loss calculation, and that Con Edison incurred those huge expenses is notable.

However, *Algahaim* and our collective experience with fraud sentences in the Southern District of New York where, last year, judges imposed within-range sentences in only 22.0% of fraud cases and varied in 60.5% makes clear that the resulting loss arithmetic need not dictate the sentence.

**B. <u>Seriousness of the Offense, Promoting Respect for the Law, and Just Punishment</u>**

The requested sentence can reflect the seriousness of this offense. Prison is not the only way to punish, deter and to otherwise respect the parsimony clause. And court supervision is not leniency. Probationers are "subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007) (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)); *see also Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (probationers "do not enjoy the absolute liberty to which every citizen is entitled"). Supervised release carries the same standard conditions and the same threat of revocation. *See* 18 U.S.C. § 3583(d), (e).

Under the requested sentence, Michael would spend a year confined to his home, three years reporting to a U.S. Probation Department officer while completing 500 hours of service to the community, and many years after that paying restitution.

And Michael has already begun to suffer the consequences of his misconduct. He, rightfully, lost his job at Vibranalysis and his salary. PSR ¶ 92. His name, rightfully, is disgraced publicly in connection with a fraud on a major utility company. He does not know whether his inspection certifications will survive this conviction, and with them a trade he spent many years building. PSR ¶ 90.

As Professor Michelle Alexander has written, "[m]yriad laws, rules, and regulations operate to hurt ex-offenders and effectively prevent their reintegration into the mainstream

society. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, *The New Jim Crow* 142 (2010).

**C. Adequate Deterrence to Criminal Conduct**

The requested sentence can provide adequate general deterrence. The available empirical evidence does not support a finding that a prison sentence necessarily produces greater deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

The message to the inspection industry is clear. A radiographer who falsifies reports will lose his career, suffer federal prosecution and a felony conviction, and be made responsible for millions of dollars in restitution, and placed under years of court supervision. No inspector looking at Michael's case would conclude that failing to perform welds is worth the risk.

**D. Protect the Public From Further Crimes of Defendant**

Studies have demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment. *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33

Criminology 587 (1995) (finding no difference in deterrence for white-collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (explaining that those assigned by chance to receive prison time and those who received none "were re-arrested at similar rates over a four-year time frame"). The Commission has similarly found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor is criminal history, and Michael is in a criminal history category I with zero criminal history points. The Commission's research shows that zero-point offenders are rearrested far less often than offenders with even one point (26.8% compared to 42.3%), "the largest difference in recidivism rates of any comparison of offenders within the same" Criminal History Category. U.S. Sent'g Comm'n, Analysis of the Impact of 2023 Criminal History Amendment (May 2023). That finding led the Commission to adopt the zero-point offender adjustment in § 4C1.1. Michael does not qualify for that adjustment because of the stipulated role enhancement. U.S.S.G. § 4C1.1(a)(10). But the data underlying it otherwise applies to him.

Michael's own conduct supports the statistics. He has been on pretrial supervision since August 28, 2025, and has complied with every condition. He stopped using marijuana on his own, every drug test has been negative, and he has documented his employment. PSR ¶¶ 4, 86–87. Probation, itself, observes that "[h]is post-arrest compliance may be indicative of a reduced

risk of recidivism." PSR ¶ 119. Since 2023, the people who work beside Michael describe him as an inspector who stops non-conforming work rather than passing it. Michael has learned what this case had to teach him.

**E. <u>Restitution and Michael's Family</u>**

The Court must consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Con Edison is the victim, and it will recover money as Michael keeps working. He earns $9,700.00 a month through his work for ACTS. PSR ¶ 95. Respectfully, every month that Michael works, Con Edison will receive a payment.

Michael is not wealthy; nor was this crime motivated by greed. His household runs at a monthly deficit even with his income. PSR ¶ 95. His wife Debra's salary as a service advisor would not cover the mortgage of their home. His 82-year-old mother and 87-year-old uncle rely on his support, including his taking them to their doctor appointments and interpreting for them. His son is in his final year of high school; his younger daughter has just begun hers. Michael is not the only adult in the family, but he is the one on whom three generations depend.

**F. <u>The Kinds of Sentences Available</u>**

The Commission, itself, has observed that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." U.S. Sent'g Comm'n, Alternative Sentencing in the Federal Criminal Justice System 1 (Jan. 2009). Your Honor has sentenced so many defendants in such a wide variety of ways considering her kinds of sentences available. My requested sentence includes what I hope you see as thoughtful ways to meet the ends of sentencing without confining Michael to a prison. I suggest a confinement prong that strips Michael of this liberty

and confines him to his house for a year when he is not working, paying towards a restitution order or serving the community. I seek the maximum supervised release term during which many major decisions about Michael's life will be made not by Michael but instead by a probation officer. The requested sentence permits Michael to continue to work and support those who need him while devoting just about every waking moment of his life making amends and rehabilitating.

## V. Conclusion

Defendant Michael Vasconcellos committed a serious crime for which he has accepted full responsibility. His offense level reflects little gain to him. He has no countable criminal history, and has complied fully with all conditions of pretrial supervision. Michael has made in his life a 180 degree turn: he has spent the years since 2023 doing everything right. Three generations of his family rely on him. And a working Michael can continue to support his family, keep them in the family home, and pay towards restitution to Con Edison from every paycheck. A felony conviction, a year of home confinement, three years of supervised release, and 500 hours of community service send an unmistakable message to anyone in his industry. The requested sentence will satisfy the factors of 18 U.S.C. § 3553(a) and the parsimony clause, and and a restitution order backed by steady employment support a sentence that punishes, supervises, and allows Michael to make amends.

On behalf of Michael Vasconcellos and his family, we thank Your Honor for your consideration, and we look forward to addressing the Court on October 28th.

Respectfully submitted,

*/s/ Edward V. Sapone*

Edward V. Sapone (ES-2553)
SAPONE & PETRILLO, LLP
40 Fulton Street / 17th Floor
New York, NY 10038
(o): (212) 349-9000
(e): ed@saponepetrillo.com

cc: AUSA David A. Markewitz (by ECF)
AUSA James F. McMahon (by ECF)